All right, I think we're ready to get started. This case is 25-4135 Lichfield v. Kubler. Good morning, Your Honors, may it please the Court. My name is Ross Meyer from Anara Law in Phoenix, Arizona. I represent Narvin Lichfield in his defamation suit and other tort claims against Ms. Kubler. Ms. Kubler is an investigative journalist who stated her intent within the documentary that it was to get revenge, like Edmund Dantes of the Count of Monte Cristo in the first episode, and then also Netflix, which we know. For the reasons in our briefing and argument here today, we request that the Court reverse the district court and allow these claims to proceed in the District Court of Utah. There's a few issues I'd like to address today. First, I'd like to touch on Los Lobos and its application here in this case with regard to anti-slap statutes. And then also I'd like to get into the defamatory statements and the issues as to whether they are fact versus opinion. And so I think it's important that, sorry, excuse me. I think it's important to start there on Los Lobos. This was an issue at the district court as to whether California or Utah's anti-slap statute arose. Here, Los Lobos controls and indicates that at the Rule 12 stage, anti-slap statutes place an impermissible procedural burden on the plaintiffs. But you didn't, unfortunately, you didn't make that argument in the district court, did you? Your Honor, that argument of Los Lobos specifically wasn't right. No, let's just say not the case. Did you argue in district court that we look at state procedural law versus federal law? I thought you had argued in district court that Utah law applies, and now you're arguing that California law applies. I don't remember in your district court argument or briefing anything about Los Lobos or the companion principle on the anti-slap issue. Your Honor, that's correct. In our footnote one of our opposition to the motion to dismiss, we did indicate that Utah's anti-slap law applied. But I think the context is important there. The motion to dismiss, what it started out with was saying that California's anti-slap statute and then Planned Parenthood arose. What did not happen in that motion to dismiss was a disclosure of this court's Los Lobos opinion and its application there. Instead, it provided a different frame. So we were arguing, no, California in the Ninth Circuit's interpretation does not apply. And so it was that structural framing of we're in the district court of Utah, Utah law applies, the plaintiff is here, the defendants flew to Utah to film the documentary, and the events gave rise there, and that's where the damages are. Well, why couldn't we view this as invited error, though, not just simply forfeiture? Because not only did you argue that Utah statute should apply, and it wasn't in footnote one, I think in the body of your opposition, you actually cited the Erie Railroad case to say the federal district court should apply the state substantive law. In other words, you told the court that the only dispute here is whether it's Utah or California, but you didn't say at all in the district court, well, no, under this Los Lobos case, you can't imply state anti-slap laws at all. Thank you, Your Honor. Two answers to that. One, our argument was that Rule 12b-6 applied at this stage, and then in getting into the anti-slap statutes, we did argue that the Utah statute would apply. I think the second part is here, a de novo review, this court can correct that record of the district court, but we don't usually invoke our de novo review to take up claims that are either forfeited or errors that are invited before the district court. I think the consistent part is that Rule 12b-6 applies, not the anti-slap statutes heightened and quicker procedural mechanisms, and if Rule 12b-6 applies, for whatever reason, if it's Los Lobos or it's because the federal rules apply, you can make that decision, and I think it would be appropriate to make that decision considering it's established law here and there's some minor circuit split on that. I don't think it would be beneficial for this circuit to have a decision indicating that Los Lobos doesn't apply or there is a question there. And so to the next point, I want to get into the defamatory statements and why they're not hyperbole, why they're not opinion. This was investigative journalism that occurred, and throughout the series, that's how it's framed. It's framed as investigation, 18 years of time put into this intent, and so three of the main statements are the ones at the karaoke event where it's specifically stated, it was surreal to see Narvin in person knowing everything I know about this guy, the children he abused, the parents he conned, and all of the crimes he's gotten away with. And I think there you have child abuse, you have conning someone, and you have crimes. Let me take maybe what I think is the softest of those references in that third segment. Let's say we go back into conference, and let's just say hypothetically, I persuade a presiding judge here to vote in a particular way, and then someone says, you know, Baccarat, Conn, Dimkovich, is that really a discreet fact that someone can, you know, that conning, you know, is a whole bunch of different meanings. There's con men, there's con women, there's, you know, somebody cons me into overpaying, you know, paying list price for a Buick. It has so many different meanings. How can that be, how can that reasonably be interpreted as a specific fact? Your Honor, thank you. The aspect is it was conning parents. Conning parents to send their kids to this institute, to this facility, and the interpretation is that the institute and Narvin lied to these parents to get them to come. And within the Episode 3 framework, you see that it's about the money. And so it's conning these parents to have their children in return for money. And that gets into fraud. That is where conning is a synonym. Let me kind of push back on that a little bit. Ms. Kubler didn't say that. She didn't say conning parents in order to entice them to pay these exorbitant tuitions. That's within Episode 3. There's the graphs of the private school. The WASP program in general, I'm talking about the specific comment, when Mr. Narchild is seen at that karaoke event. It's a surreal thing that the people he conned. In that statement itself, it ends there, right? It doesn't say conning parents in order to pay exorbitant tuitions, in order to abuse their kids. Your Honor, it was said collectively together. It was the children he abused. That's specific, and especially in today's day and age. Well, that's why I'm not asking about that. Of course. Right. Then the parents he conned. I think conned within the normal meaning that a reasonable viewer watching this documentary is going to say is, well, that's a con man. That man's committing fraud. I wouldn't want to be called a like type of con man, but I don't think there's a good way to take it. I see. I think that's the point, is that this was specific. It was within investigative journalism. The phrasing didn't come with any hyperbolic statements. It wasn't said at a heated city council meeting. This was said in a very clear, deliberate framework. I want to get to- What do you think, sticking with that karaoke episode, what crimes do you think she was referring to? Child abuse and fraud. What Utah law regarding child abuse? I mean, the crime of child abuse. The crime of child abuse would be punishable by criminal statute. It's also highly defamatory and can injure one's reputation to be accused of that, especially if you're within the industry of teaching and- Was there something else in the documentary that alleged beatings of minors or sexual abuse? Something that's fairly specific, because my problem is we know these are fairly general terms. They can mean a lot of different things, and they can be hyperbole contextually. You need to get to a little more specific context here where the reasonable viewer of this documentary says, Mr. Litchfield's a bad person and committed crimes that could be proven under Utah state law. Yes, Your Honor. And so throughout the series, there's allegations of hitting children, strangling children. There's implications and indications that a child- By him or by staff? By staff. But I think that implication carries forward when you're saying Narvin committed the child abuse, committed conning parents. That's where that gets to is that it bleeds together if you take a look at the complete episode and series. And I think where- So there was allegations of strangulation of students? There was a scene where, at a lunch scene, a student died, where the security staff restrained him or her, and the student passed away. How does your argument overcome this court's reasoning in Hogan, where, in that case, there was a specific accusation that the plaintiff had committed extortion, and it was Utah defamation law, and our court came out the opposite way of the argument you're making? Yes, Your Honor. And I think where it comes in on Hogan is that, number one, this is more specific, and number two, the omissions here do give rise to defamation by implication. And that theory is that while you're permitted to omit information if it might give you a more reasonable or better view in the public, you don't have to if it only might or may. Here, when we're talking about the Costa Rica arrest, where it says Narvin was arrested, what was left out was that the court in Costa Rica found him innocent. And that was left out. We know that was known by the defendants because it's included in Exhibit 6 to their motion to dismiss. Well, if Ms. Kubler had said that, it still would have been incomplete, right? Because was it also the finding of the Costa Rican adjudicative body that there was abuse in that facility? It's just he didn't do it. Well, it goes to— Am I right about that, by the way? You're right that they thought there were allegations, but it was not proven, is what it was. It wasn't proven that Mr. Litchfield committed the abuse. But there was not an exoneration about abuse within the facility. But what we're claiming is did Narvin commit the— No, I understand that. I'm just asking. There's actually three aspects of what would need to be stated to be complete under your iteration. One is there was abuse in the facility. He was arrested, and he was ultimately determined to be innocent of the abuse, right? That's correct. And my point is that there's a difference between when exculpatory evidence might change a perspective and when it absolutely will. And knowing someone was found innocent, I think a reasonable person would find that that absolutely would change the perspective. Your Honors, I'm going to reserve my final one minute. Thank you. Good morning, Your Honors. Natalie Spears on behalf of Ms. Catherine Kubler and Netflix. May it please the Court. Could you get a little closer to the mic, please? Thank you. Is that better? Better. Oh, that's much better. Thank you, Your Honor. This Court should affirm the District Court's decision. Appellant's position, which we just heard more of this morning, is an attack on fundamental principles of free speech under the First Amendment and Utah's Constitution. The District Court correctly dismissed this case in a context-driven and important decision based on those fundamental principles that protect the right to express opinions and true statements and doom Mr. Litchfield's claims here. Respectfully, the dismissal of his meritless claims is not a close call, and indeed it's vital to protect free speech on matters of public concern. I'll turn first to the statements of opinion that are at issue. The District Court correctly held that in the context of telling her own painful and deeply personal story, Ms. Kubler's statements, the getting away with statements, were classic expressions of hyperbole and protected opinion under the First Amendment and the factors set out by the Utah Supreme Court in West v. Thompson, not statements of verifiable fact. The West factors are context-driven, non-exhaustive, and decidedly point to opinion here, as the District Court held for several reasons. You know, the allegation, let's go back to the karaoke segment, because I think that's the most problematic here, in my view. And in the context of the documentary, isn't it clear that she's accusing Mr. Litchfield and his company of committing the crime of child abuse in the way they've operated the facility and how they've employed their disciplinary approach here? And that's not necessarily opinion. It could be in a different context. But here, why is that a statement of fact that could be provably false under our case law? And is that enough to get you over the 12B6 hump? No, it's not here, Your Honor. And this is important because the test is a four-factor test, not a one-factor test. You look not just at the words that are spoken, but you look at three other factors as well. If it were one factor, as the plaintiff wants to argue here in his papers, then that would be one thing. But it's four, and the whole reason why it's context-driven is to carefully protect opinions. And here, you look at Ms. Kugler's statements, first of all, at the karaoke bar. They were generalized, hyperbolic, and unspecific. She's expressing her... So she's expressing her opinion on whether he committed a crime under Costa Rican law? No, she's expressing her... Costa Rican law, like Utah, like Oklahoma, like Kansas, like most states that I know, criminalized child abuse, right? That's what he was charged with, was abuse, right, in Costa Rica. So how is it hyperbole to say that Mr. Larchfield committed the crime of abusing children? I mean, maybe it applies to the conning parents and the like. But Judge Tibbetts is asking you about something that I don't... I don't understand how you can argue that it's hyperbole to say he committed a specific crime under Costa Rican law. But that's not what she says there. And what she says there is very generalized and hyperbolic. And it's offering her strong opinion that the methodologies that he used at WASP facilities were abusive. She never personally accuses him of physically abusing anybody. She didn't say in Episode 3 that it was so surreal, the children he abused? Yes, but that's why you look at the entire context. And if you look at the specific emotional setting, she says it was surreal to see Narvin Litchfield in this setting. Because, yeah... And you look at the broader context, Your Honor, and you put that in the broader context of this gut-wrenching personal story, and she's wrestling with her feelings of abandonment and her emotional experience, and she's expressing all of that throughout. And when you put it in that context, as the district court said, the statements are best understood as rhetorical hyperbole, emphasizing her criticism of WASP tactics and her moral exasperation of the people who made money off of them. So she's not... She's in the tradition of cases like Greenbelt, where there's a long tradition in this country of using hyperbole to make a point. She's not accusing him of a specific criminal act. That's not what's going on there. And to do that is divorcing it from its context, which you can't do under West or the First Amendment. Right. You know, under the case law that you're relying on, you know, one of the aspects is, you know, you look, like you said, at the broader context. And I think you use examples of an editorial. Is the context of a... When I watch a documentary, I'm not expecting to read the editorial page. I'm expecting facts. And so is the context, especially at a 12 v. 6 stage, are you saying that as a matter of law, that one factor of the context of a documentary is that you shouldn't be expecting when somebody says something that may otherwise seem like a fact, you should read it like an editorial page, that this is just hyperbole or just an opinion. When I watch documentaries, I'm not expecting hyperbole. I'm not expecting opinions. I'm expecting facts. Why is that unreasonable, at least under the liberal stage that we interpret complaints under 12 v. 6? Because that's just another context point, Your Honor. Not all documentaries are the same. Here, we've always said this is both a personal memoir and a docu-series. And it nowhere says it's completely neutral. She offers her opinion, her moral outrage, her calls for change in the law throughout. And her emotional, exaggerated expressions of criticism of the WASP programs and of plaintiffs for using that methodology has to be looked at in that context. That is the whole point of the West v. Thompson test. And that's the point of the Supreme Court's case law in the Greenbelt line of cases. Because you do look at the language that's used here. It was generalized, nonspecific, set in a hyperbolic way and tone. And then you also look at the setting. Counsel, can I ask you how much work her bias does in our contextual analysis? Meaning, Judge Bachrach was asking you about watching a documentary. It's not the same as reading an editorial page. Well, but here, as I understand it, this three-part series, the whole message she is conveying is I was a victim of one of these facilities, not the one at issue here, but another one. And I'm here to expose these facilities for what she says is, you know, child abuse and conning parents and all these things. So her admitting her bias, which I think she does at the beginning, and the message she's trying to convey, does that help your argument in our contextual analysis? Or, on the other hand, does it present a problem for you? Because if we look at the entirety of the message, the viewer may say, well, she of all people knows how these facilities operate. And so she's coming at this, as you said, from her personal background. And so here she is saying that this man abused children, and that's believable. I think it helps the analysis, Your Honor, because it is a personal story. It is emotionally gut-wrenching what she talks about. And viewers would look at it through that lens. Also, I'll give you an example. Mr. Litchfield, he admits he owned WASP facilities that use WASP methodologies that he admits are controversial. And even in one of the clips in the series that's played, he says, quote, I'm either a sinner or a saint based on whatever argument you want to believe. Well, that's the point. Different people view these methodologies differently. Some think they're tough love, tough discipline, and effective treatment. And other people, like Ms. Kugler, think they're abusive, ineffective, waste of parents' money, and should be outlawed. There's a difference of views, and she's clear about her views in the series. So I think contextually you look at that. Every case is different. But here I think it signals to a viewer that this is opinion when she's making those statements in a hyperbolic and emotional way at the end of the series, in visceral, surreal reaction to seeing him. At the end of the day, in light of the generality and the hyperbolic nature, the emotional context of the language spoken itself, and the broader setting of a passionate story, yes, in a documentary but also giving her opinions throughout, her comments were correctly held by the district court to be best understood and would be understood by a reasonable viewer as opinion. I think that's an interesting response to Judge Federico's opinion. I hear you saying we have an unreliable narrator, a biased observer, and because of that, we should undervalue or interpret statements of fact. Arguably he committed child abuse. She should get the benefit of the doubt, or because she's an unreliable narrator, we should interpret those as hyperbolic statements rather than statements of fact. Well, I'm not saying she's an unreliable narrator. I'm saying she's a narrator with an opinion that's made clear throughout. So that's a different point. She said she's emotional. Yeah, the setting is emotional. A passionate narrator here. Yes, that's right, and that's consistent with the long line of cases, the Greenbelt letter carriers and others where the speakers are passionate and our country has a long tradition of protecting use of hyperbole and emotional statements to make a point. Let's say hypothetically I had opened a WASP center, and would Ms. Cooper be able to say and avoid liability for defamation, assuming it's untrue, Bob Bacharach abused children because she has her own experience of being abused at Ivy Ridge. The first two episodes, for example, say nothing about Narvin Ridgefield. He's not introduced until episode three. So just like Mr. Litchfield, does the fact that she had this terrible experience at Ivy Ridge, is she able to just say, well, Bacharach abused kids, Narvin abused kids, and we just say, well, she had a bad experience and so she can say these things because she has her own perspective about what Robert did, his brother, and what the administrators at Ivy Ridge did. How is that a meaningful legal principle for us to hang our hat on? The legal principle is that you look at it in context. And here, as the district court said, throughout she makes it clear that her statements and her opinions are that these programs and the methodology is psychologically damaging and that it is a problem. And so it's in that context that you look at it. It's like the Rinsley v. Brandt case. There the author made accusations against the plaintiff. It was a personal attack against this psychologist, but it really was an attack that was about his methods and the methods he was using. So it's just like that. It's a personal attack against the man directed at the methodologies. And there the court correctly, I believe, this circuit held that it was protected opinion, exaggerated emotional negative criticism. If I can quickly turn to the Costa Rica statement. I'm sorry, before you do, on the karaoke incident too, part of her statement that I linger on is not, it's what comes before she says the children he abused, the parents he conned, and all the crimes he's gotten away with, where she's saying everything I know about this guy. She's making it specific to him and not saying everything I think or everything I'm here to investigate or potentially expose. She's saying I know, like I have factual information. How much work does that language do? What she's saying there is she's telling you it's signaling everything I know based on what I've just showed you. So that comes in episode three. She hasn't shown anything about him yet, right? Well, in episode three she's talking about the people who made money off of methodologies she thinks are abusive. But to Judge Bacarach's point, those are other people. Now she's specifically directing this towards Mr. Litchfield. Right. Well, she's directing it to people who she thinks made money off of these programs and methods she thinks were abusive. And so in that context she's saying these are my feelings based on what I know. And she also does use the word I think later in that segment. So I think viewers would understand this is a visceral expression. On the Costa Rica statements, I would just say there is no claim for a true statement that he was arrested in Costa Rica. It was the truth of what happened. He wants the editorial pen here to add facts, which as this Court recognized in Broker's Choice. Well, Broker's Choice didn't say anything about a half truth. In fact, I think Judge Matheson said that this is not what NBC had allegedly done in Broker's Choice. So that's the distinction that I see in Broker's Choice. Am I wrong about that? I thought the argument that the broker made against NBC was that, well, NBC didn't air all of this other footage. All this other footage NBC had that it didn't air that showed exonerating things about what this broker did. But it wasn't like this where it said, well, Bob Bacharach was arrested and they failed to disclose that as soon as they arrested me, and I'm changing the facts, well, they figured out, well, it's a different Bob Bacharach. They arrested me, but it was a mistake. Here, obviously, Mr. Litchfield is saying, well, he was arrested, but then he was ultimately found not just that he wasn't proven guilty, but that he was innocent. That seems different than Broker's Choice to me. Am I wrong about that? I see my time is up, but I'd like to answer your question. Yes, you are, Your Honor. First of all, it is the same, even stronger here in Broker's Choice. There they said that additional facts would have mitigated the sting. Here the additional facts are just an additional point that happened later. She doesn't have to say or go into a deep dive about what happened subsequently in the case. What she said was true. He was arrested, his school was shut down, and he opened a new one a few months later. She never implies that he was convicted, just the opposite. She implies nothing happened to him, which is, of course, the broader point she was making. And she's entitled under the First Amendment in Broker's Choice to make that different point. He doesn't get the editor's pen to rewrite her speech after the fact. Is Netflix a media defendant in this context? Yes, it is. And the statements were of public concern? Absolutely. They were of public concern, HEP supplies, and the important statement in Broker's Choice where the court recognized that a media defendant doesn't have to add facts just to make the plaintiff look more to his liking. That's the exact opposite of what the First Amendment requires. And the parties agreed that Mr. Litchfield was a private individual? We didn't agree on that fact, but that's just a separate issue of whether he's a public figure and the separate standard of actual malice applies. What's your position on that? He is absolutely a limited purpose public figure, and he did not plead actual malice at this stage. And I know there were some statements at the beginning of his remarks about the issue of the Anti-SLAPP Act. He clearly waived that. That only goes to whether or not fees are provided here, and we believe they should be, and that part of the district court's decision should be affirmed too. But if that's not waiver, I don't know what is when you affirmatively argue that the acts apply in federal court. So we'd ask this court to affirm the district court's decision. Thank you. Thank you, counsel. Could you give Mr. Meyer two minutes? Thank you, Your Honor and Your Honors. I want to start by indicating that a number of the questions and argument that we just heard is the Rule 12 issue. And at the pleading stage, while you can look at the fact versus opinion and the statement and whether it can cause defamation, a number of the other aspects that we're looking at, once you determine that a reasonable viewer may find them defamatory, then they go to the trier of fact, and I think that's a critical aspect here. And then with each of the statements, they do meet the West factors with the common usage, whether they're verifiable given the full context, and then also the broader social context here, which is an investigative journalism platform on this issue. And then I also think in Greenbelt, what Justice Stewart indicated there is that case would have been different if the other side wasn't given in the news article. And here, the other side was not given at all. It was framed as he's committed child abuse, he's conned parents, or he was arrested in Costa Rica without the other perspective. And that's seen in the documentary in a number of places, but primarily where Ms. Kubler is showing her investigative journalism board to another investigator and indicating that this is my investigation, this is my facts. Not that this is my opinion, but that this is what I've done, this is the knowledge I've come with, and this is what I'm sharing with the entire world, not just some small subset. But I think it's important here to know that it's published with Netflix, which does carry weight as to the investigation that is done and the thoroughness that is done. Counsel, can I ask you about what is kind of a collateral issue, but it's a concern I have about how this case was presented. In the response brief, the appellees note that there were citations to a D.C. Circuit case that don't exist. There were citations to a restatement of torts that didn't exist. And then in the reply, there's a preliminary statement. I know you didn't author the briefs, but in the preliminary statement, it says, well, those errors have been corrected. How were those errors corrected? Your Honor, I think my understanding is that that issue, the quotes in the reply brief and argument, corrected those statements and then also acknowledged those errors. If you need us to file something, we will to note that. We had a recent order that kind of addressed this with hallucinated case citations. And in that case, there I think were seven hallucinated citations. And the author filed a corrected brief, took responsibility. And that was two years ago when AI was still coming about. And so my concern here was not just that there was no corrected brief filed, but then in the reply brief in this preliminary statement, it said, yeah, yeah, okay. So we filed hallucinated citations. But then it really like goes on the attack, the other side. And so I look at, you know, was the author of the brief really showing contrition here about presenting case law that doesn't apply to this court? My understanding is that, yes, there is contrition there. And when I've seen this, not myself, but what I tell other lawyers going through that issue is be straight with the court. Come up and point to the error directly. And so I'll work with Mr. Hepworth, and we'll get a notice on file that directly corrects those statements and states that. But to the point of the brief, and I realize I've gone over, I apologize, is that we were pointing to miscitations in the appellee's answering brief. I think that was where it went on the attack slightly. But thank you, Your Honor. We'll look forward to seeing that. Time's expired. Counsel are excused, and the case is submitted.